

1  **MEIR J. WESTREICH [CSB 73133]**
   **Attorney at Law**
2  **221 East Walnut, Suite 200**
   **Pasadena, California 91101**
3  **626-440-9906 / FAX: 626-440-9970**
   **meirjw@aol.com**
4

5  **Attorney for Plaintiff**

6

7

8
                    UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10

11  ANDERS KARLSSON,                    ) Case  No. CV
12                        Plaintiff,    ) COMPLAINT FOR DAMAGES,
                                        ) CONSTRUCTIVE TRUST
13  v.                                  ) AND/OR INJUNCTIVE /
                                        ) DECLARATORY RELIEF
14  JOHN  LEO  MANGAN III;  ART         )
15  POSSIBLE, LLC, a Florida Limited    ) JURY DEMANDED
    Liability  Company;  MICHAEL        )
16  WILLIAM  FORCE,  TARYN              )
    BURNS;  ART  FORCE,  LLC,  a        )
17  Florida Limited Liability Company;  )
    RAVEN  ART,  INC., a  Colorado      )
18  Corporation; JOVIAN "JOHN" RE;      )
    and LESLIE JAMES,                   )
19                                      )
                        Defendants.     )
20  _____    )

21                      **INTRODUCTION**

22          This is a diversity action in which an Arizona Plaintiff is seeking damages and

23  equitable [injunctive and declaratory] relief against California, Colorado, New York

24  and Florida Defendants, in connection with two multiple inter-locking fraudulent

25  schemes, mostly involving fake or forged artworks of renowned deceased artists and

26  fake or forged authentication and/or provenance documentation, among conspiring

27  Defendants acting in concert to effect and conceal the schemes.

28

    COMPLAINT FOR DAMAGES, CONSTRUCTIVE TRUST AND/OR INJUNCTIVE / DECLARATORY RELIEF

In connection with a few likely authentic artworks involved and remaining in possession of Defendants or their agents, sometimes without required consent of Plaintiff, Defendants are refusing to comply with their contractual and other lawful obligations to Plaintiff intended to secure Plaintiff's interests and rights therein.

Plaintiff expended in excess of $4,000,000 in these schemes, induced by the Defendants' materially false representations regarding authenticity and provenance of the involved artworks, and materially false representations regarding their intent and ability to provide proof of authenticity and provenance of the involved artworks.

Defendants are continuing to refuse to comply with contractual obligations, arising from the agreements of the parties or implied by law. In each claim, Plaintiff has been damaged in excess of $75,000, with a cumulative damages estimated in excess of $2,000,000. In some of the claims, temporary, preliminary and/or permanent injunctive or other equitable relief is necessary to protect Plaintiff's material interest and rights in the involved artworks.

Accordingly, Plaintiff alleges for his Complaint [all jurisdictional and common allegations are deemed incorporated into all of the numbered claims; and all allegations in each numbered claim are incorporated into each and all of the remaining claims which follow]:

## COMMON ALLEGATIONS
## JURISDICTIONAL AND PARTY ALLEGATIONS

1. This is a diversity action at law and in equity by Plaintiff, who is domiciled in Arizona, to redress the contract breaches and torts by Defendants, who are each domiciled in California, Colorado, Florida or New York.

2. The jurisdiction of this Court is invoked under 28 U.S.C. §1332, this being an action between an Arizona Plaintiff and California, Colorado, Florida and New York Defendants. The amount in controversy under each claim is in excess of $75,000, exclusive of interest and costs.

3.  Venue is properly located in the Central District of California because the claims in controversy – involving contract breaches and torts – were consummated in Los Angeles or Santa Barbara Counties, California, and the corpus thereof is largely located in Los Angeles County, California.

4.  Plaintiff is ANDERS KARLSSON, who is "domiciled" in the State of Arizona, *i.e.* meaning Arizona is where he maintains his permanent home, where he resides and intends to remain.

5.  Individual Defendants are: JOHN LEO MANGAN III, who is domiciled in the State of Colorado; MICHAEL WILLIAM FORCE, who is domiciled in the State of California; TARYN BURNS, who is domiciled in the State of California; JOVIAN "JOHN" RE, who is domiciled in the State of New York; and LESLIE JAMES, who is domiciled  in the State of California.  References in this paragraph to "domicile" means that the mentioned state is where s/he maintains her/his permanent home, where s/he resides and intends to remain.

6.  Entity Defendants are:

a.  ART POSSIBLE, LLC, which is a Florida Limited Liability Company established under the corporations code of, and chartered by, the State of Florida, and which maintains its principal place of business in the State of Colorado where (1) it performs a substantial predominance of its corporate operations, (2) its executive and administrative functions are performed, and (3) all of its members, including but not limited to Defendant Mangan, are domiciled [hereinafter "Art Possible Defendants"];

b.  ART FORCE, LLC, which is a Florida Limited Liability Company established under the corporations code of, and chartered by, the State of Florida, and which maintains its principal place of business in the State of California where (1) it performs a substantial predominance of its corporate operations, (2) its executive and administrative functions are performed, and (3) all of its members, including but not limited to Defendants Force and Burns, are domiciled [hereinafter "Art Force Defendants"]; and

c.  RAVEN ART, INC, which is a Colorado Corporation established under the corporations code of, and chartered by, the State of Colorado, and which maintains its principal place of business in the State of Colorado (1) where (i) it performs a substantial predominance of its corporate operations, and (ii) its executive and administrative functions are performed; (2) is controlled by its President, Defendant Mangan; and (3) with the supporting shares of the spouse of Defendant Mangan, is *de facto* majority owned by Defendants Mangan and Force [hereinafter "Raven Art Defendants"].

7.  All references to "Defendants" or "Art Possible Defendants" or "Art Force Defendants" or "Raven Art Defendants" [hereinafter "Defendant Groups"] include by the reference any persons or entities acting through or in concert with any of the mentioned Defendants or Defendant Groups.

8.  Commencing in early 2012, Defendant James made concerted efforts and solicitations to encourage Plaintiff to provide investment capital for the purchase from other named Defendants and/or Defendant Groups, as hereinafter set forth, of alleged previously unknown artworks of reknowned artists repair, restoration and resale whose authenticity and valid provenance was purportedly assured; and for publication in Defendant James' then planned book of his personal art collection.

9.  Commencing with an initial loan on July 13, 2012, Plaintiff was induced by the Raven Art Defendants to join an enterprise which became a joint venture with the Defendant Raven Art under a Joint Venture Agreement [hereinafter "JVA"], in connection with an artwork – an alleged Jackson Pollock Drip Painting [51" X 81"] [hereinafter "JVA Artwork"] – in which Plaintiff owns a 23.5% interest purchased for a $1,000,000 capital investment.

10.  Also commencing in mid-2012, Plaintiff has been induced by the Art Force Defendants and the Art Possible Defendants to engage in various joint venture agreements with the Art Force Defendants and/or the Art Possible Defendants, some in writing and others oral, in connection with renowned artworks, in which Plaintiff

holds 100% interest purchased with capital investments hereinafter described, with one or more Defendants entitled to 40% to 50% of net resale proceeds expressly conditioned on their timely and effective provision of certain specified services, authentication, valid provenance and assistance with sales in connection with the artworks.  In some of the joint ventures, the artworks are owned by either the Art Force Defendants or the Art Possible Defendants, with Plaintiff entitled to 50% of net resale proceeds  conditioned on his providing capital for repair and restoration, and payment of authentication, provenance and sales experts, with said Defendants remaining at all times solely responsible for timely and effective provision of authentication and valid provenance in connection with the artworks.

11. All of the aforementioned artworks-related joint ventures were expressly conditioned on representations of involved Defendants as to the authenticity and valid provenance of each of the involved artworks.

12. In connection with many of the joint venture arrangements by Plaintiff with one or more Defendants or Defendant Groups, Plaintiff made personal loans to one or more Defendants as hereinafter alleged, sometimes with collateral, some of which are not authentic – *e.g.* they are fake or forged.

13. Commencing in mid-July 2012, Plaintiff was also induced by the Art Force Defendants and the Art Possible Defendants to enter into initially a loan, and then a joint venture purchase via a limited liability company, of a pleasure yacht in Florida, under which Plaintiff is the now the 100% owner with all prior joint ownership agreements voided.  Plaintiff supplied $1,000,000 in initial purchase and repair / restoration capital, with additional capital costs since purchase, based on representations of said Defendants of their intent to provide capital contributions and other representations as hereinafter alleged.

14. Each of the transactions and agreements mentioned herein were formed under the laws of the States of California and arose and were to be performed in whole or in large part within the Central District of the State of California.

15.   Each of the torts mentioned herein occurred in whole or in large part within the Central District of the State of California.

16.   At all times pertinent to this Complaint, each Defendant was and is an agent of each other Defendant and all of them. Without prejudice thereto, alternatively, the Art Possible Defendants and Defendant Re are each an agent of each of the other Defendants included or mentioned therein, and all of them; the Art Force Defendants and Defendant Re are each an agent of each of the other Defendants included or mentioned therein, and all of them; and the Raven Art Defendants are each an agent of each of the other Defendants included or mentioned therein, and all of them.

17.   The Defendants herein, and each of them, have conspired to do the acts and wrongs mentioned herein; and in connection with each conspiracy, an act in furtherance thereof has been committed.

18.   At all times pertinent to this Complaint, the Defendants and Defendant Groups, and each of them, were acting in concert with each and all others.

19.   At all times pertinent to this Complaint, each of the  Defendants and Defendant Groups authorized and/or ratified the acts, omissions, representations and agreements of each of the other Defendants and Defendant Groups.

20.   At all times pertinent to this Complaint, the Defendants and the Defendant Groups were each an agent of Plaintiff, and hence each held fiduciary duties and obligations in favor of Plaintiff.

### COMMON FACTUAL ALLEGATIONS

21.   Prior to 2012, and for the preceding twenty one [21] years, and continuing to this date, Plaintiff was and is engaged in the business of mining, procuring and wholesale and retail purchases and sales of boutique minerals, fossils, gems and natural history items [hereinafter "Mineral and Fossil Business"].

22.  Prior to 2012, and for the preceding thirty [30] years,  and continuing to this date, Defendant James was and is engaged in the business of *inter alia* buying, repairing, restoring and/or selling natural history pieces and artworks of reknowned artists [hereinafter "Artworks Resale Business"].  A key component of this business is the provision of authentication and valid provenance of such artworks as a necessary predicate of resale.

23.  For nineteen [19] years preceding 2012, Plaintiff was a personal friend of Defendant James, with whom (a) he did occasional business in connection with Plaintiff's Mineral and Fossil Business, and who occasionally sought to interest Plaintiff in his own business; (b) he had longstanding business relationship with as a wholesaler of natural history items; and ( c) he had partnered in with an art furniture and art gallery business.

24.  In early 2012, as a result of their personal relationship, and the personal trust engendered thereby, Defendant James became aware of an imminent sale of Plaintiff's interests in one of his companies then engaged in the mining of commercial minerals, which would afford him a substantial infusion of investment capital.

25. Commencing in early 2012, in connection with the aforementioned efforts and solicitations by Defendant James, Plaintiff was introduced by Defendant James to the Art Force Defendants, with Defendant James completely and unreservedly vouching for their personal friendship, integrity, honesty, and good character and reputation; and for the excellent authentic artworks they were acquiring and selling, and making available for purchase or joint investment.

26.  Prior to 2012, and for the preceding fifteen plus [15+] years,  and continuing to this date, the Art Force Defendants were and are engaged in the Artworks Resale Business.  A key component of this business is the provision of authentication and valid provenance of such artworks as a necessary predicate of resale.

27.  After such introduction by Defendant James in early 2012, the Art Force Defendants affected friendship to Plaintiff, making their home available to Plaintiff at a time of personal domestic turmoil in Plaintiff's personal life, and offering to introduce Plaintiff to good and profitable investments in artworks resales.

28.  In offering these investment opportunities, the Art Force Defendants represented to Plaintiff that they and their investment contacts had been able to locate artworks of reknowned artists which, because of problems in condition or documentation, were capable of certain repair, restoration and correction with necessary capital expenditures, they could procure for purchase and resale [hereinafter "Artwork Capital Investments"], under ancillary agreements – some written and some oral – in which Plaintiff would supply the capital for the Artwork Capital Investments, and Art Force Defendants would supply the purchases, contacts, expertise, authentication, valid provenance, marketing and resale [hereinafter "Earn-In Contracts"].

29.  In offering these investment opportunities  and making these representations, the Art Force Defendants introduced Plaintiff in early 2012 to the Art Possible Defendants and Raven Art Defendants as persons and entities with whom the Art Force had been and were doing business, completely and unreservedly vouching for their personal friendship, integrity, honesty, and good character and reputation; and presenting them as key sources of the aforementioned Artwork Capital Investments.

30.  Upon said introduction, the Art Possible Defendants made the same representations to Plaintiff regarding aforementioned Artwork Capital Investments, and also completely and unreservedly vouched for the personal friendship, integrity, honesty, and good character and reputation of the Art Force Defendants.  The Art Possible Defendants also purported personal friendship with Plaintiff.

31.  Thereafter, in mid-2012, the Art Force Defendants and Art Possible Defendants represented to Plaintiff that they had a major source, Defendant Re, for

acquisition of renowned artworks for the aforementioned Artwork Capital Investments offered by the Art Force Defendants and Art Possible Defendants, which would also include ancillary Earn-In Contracts for Art Force Defendants and Art Possible Defendants.

32.   Upon said introduction, the Art Force Defendants and Art Possible Defendants made the same representations to Plaintiff by completely and unreservedly vouching for the personal friendship, integrity, honesty, and good character and reputation of Defendant Re and the artworks he was presenting for sale.

33.   As regards the aforementioned representations regarding Defendant Re, the Art Force Defendants and Art Possible Defendants further represented that doing business with Defendant Re required that (a) all contacts with Defendant Re would be made via the Art Force Defendants and/or Art Possible Defendants and (b) all capital investment payments by Plaintiff would be made by direct bank wire to Defendant Re.

34.   In making the aforementioned representations, the Art Force Defendants and Art Possible Defendants also represented that many of the anticipated artworks purchases and sales would be fully consummated in a matter of a few months, with assurances that requisite authentication and provision of valid provenance were already or readily available.

35.   The Art Force Defendants and Art Possible Defendants gave credence to their introductions, representations and business proposals by introducing Plaintiff to wealthy purchasers of extremely expensive artworks, who were known to have valuable art collections and who were sometime artwork customers of the Art Force Defendants and Art Possible Defendants; and who had allegedly also purchased and/or invested in artworks from Defendant Re.

36.   In December 2012, Art Possible Defendants and Art Force Defendants induced Plaintiff to purchase a pleasure yacht for their ostensible mutual benefit, with allegations that (a) the vessel was a capital investment because its fair market value

was more than 200% of the combined purchase price and related capital repairs [hereinafter "Gross Yacht Purchase Price"] and (b) said Defendants would be shortly supplying two thirds of said Gross Yacht Purchase Price from their anticipated shares of imminent artworks sales under the aforementioned Artwork Capital Investments and other artworks that they personally owned.

37.   Based on the aforementioned, and as hereinafter alleged in greater particularity, Plaintiff made capital investments for the purchase, in whole or in part, of (a) ostensibly authentic, reknowned artworks with ostensibly valid provenance, all or most of which are in fact fraudulent, forged and/or fakes in material particulars, for a cumulative capital investment of at least an estimated $2,823,500; and (b) a pleasure yacht purchased for the prospective benefit initially of Art Possible Defendants and Art Force Defendants, with capital supplied by Plaintiff that exceeds it fair market value and that is far less than the value represented to Plaintiff by said Defendants, who presented themselves as expert in these matters, for a cumulative capital investment of at least an estimated $1,355,000.

### FIRST CLAIM

**Artwork Capital Investment, Fraud in the Inducement,
and Breaches of Contract and Fiduciary Duties**

***[Defendants Raven Art, Inc; John Leo Mangan III;
Michael William Force]***

38.  On August 13, 2012, Plaintiff entered into a Joint Venture Agreement with Defendant Raven Art ["JVA"] under which Plaintiff purchased, for $1,000,000 [hereinafter "Plaintiff's 23.5% Interest"] in an ostensible Jackson Pollock painting named "Lucifer II" ["JVA Artwork"], which Raven Art Defendants represented to be provably (a) authentic and (b) with valid provenance, which material representation were relied upon by Plaintiff in entering into the JVA and providing the purchase price / investment capital.

39. Plaintiff initially loaned $65,000 to Defendant Raven Art on July 13, 2012. This sum was rolled over into the JVA and, with an additional $935,000 paid on August 24, 2012, combined to equal Plaintiff's purchase price / investment capital.

40. At the time of the JVA, shares of Defendant Raven Art were held in the following proportions: (a) Defendant Mangan, twenty-five percent [25%]; (b) Defendant Force, twenty-five percent [25%]; ( c) Defendant Mangan's spouse, twelve-and-one-half percent [12.5%]; and (d) remaining shareholders, including the prior owner, totaling thirty-seven-and-one-half percent [37.5%]. No material changes have occurred since then.

41. At all relevant times, Defendant Mangan has been President of Defendant Raven Art;, and the JVA was executed by Defendant Mangan, as President and on behalf of Defendant Raven Art, with formal approval and ratification of Defendant Raven Art.

42. At the time of the JVA, the JVA Artwork was stored in a professionally acceptable location in Long Island City, New York.

43. Express provisions of the JVA provide that the JVA Artwork can be moved from its location only with (a) advance written consent of Plaintiff and (b) insurance approved by Plaintiff.

44. Under other express provisions of the JVA, the JVA Artwork may not be sold for less than thirty million dollars [$30,000,000] without Plaintiff's written consent; and Plaintiff's share of any sale price is the first one million dollars [$1,000,000] plus twenty-three-and-a-half percent [23.5%] of the remainder.

45. Under other express provisions of the JVA, Raven Art Defendants were (a) required to disclose, prior to or concurrent with execution of the JVA, all liens and obligations of Defendant Raven Art and/or the JVA Artwork; (b) required to reserve a sufficient portion of Plaintiff's capital contribution to fully capitalize any repairs, restorations, expert reports, marketing and selling of the JVA Artwork hereinafter "Reserve Karlsson Capital Account"; and ( c) make any shareholder distributions of

Plaintiff's capital contribution in accordance with the percentage share of each of them.

46.   Contrary to the aforementioned provisions and representations of the Raven Art Defendants, and in material breach of the JVA:

a.  The JVA Artwork was moved from its original location to an expert chemical art researcher in London, England ["AAR"], without the requisite consent of Plaintiff, under a contract with a company which was not timely disclosed to Plaintiff.

b.  The JVA Artwork was moved from its original location without any requisite insurance or Plaintiff's consent to same.

c.  The JVA Artwork was moved from its original location to an expert chemical art researcher in London, England, under a contract with, and under the control of, a third party company that pre-dated the JVA and which was not timely disclosed to Plaintiff.

d.  Raven Art Defendants paid from the Karlsson capital contribution to Defendants Mangan and Force six-figure commissions or finders' fees under agreements therefor which were not timely disclosed to Plaintiff and materially altered the shareholder distribution, as required under the JVA.

e.  Raven Art Defendants failed to maintain the requisite, sufficient sum in the Reserve Karlsson Capital Account, and now claim to and in fact lack sufficient funds to meet the requirements for which that account, and Plaintiff's capital contribution, were *inter alia* required and intended by the JVA parties.

f.  Raven Art Defendants deny that they are bound to comply with the JVA as described in Paragraphs 40-44, *supra*, and have stated their belief that they are  not obliged to secure the consents and insurance specified in Paragraph 41, *supra*.

47.  The Raven Art Defendants have further materially breached the JVA and their legal duties to Plaintiff by:

a. Commingling Reserve Karlsson Capital Account funds with Raven Art company funds, and commingling the JVA Artwork with other artworks belonging to the Raven Art Defendants when shipping, crating, and obtaining expert analysis and report writing; and

b. Refused to satisfy Plaintiff's repeated demands for full and adequate accounting of expenditures of Reserve Karlsson Capital Account funds, and concomitantly failed and refused to perform their independent duty to do so.

48.  The conduct of Raven Art Defendants as described under this First Claim breached the JVA with Plaintiff; breached the covenant of good faith and fair dealing that is implied by operation of law; breached their fiduciary duties to Plaintiff; and defrauded Plaintiff with material misrepresentations as above-described.

49.  Plaintiff is informed and believes that Raven Art Defendants are equitably estopped from denying the agreements alleged herein, having made promises on which Plaintiff detrimentally relied, and having materially benefitted from Plaintiff's acts in reliance.

50.  Plaintiff has at all times complied with his duties and obligations under the JVA with the Raven Art Defendants, and performed all promises made by him to the extent obliged thereby; and/or has been ready, willing and able to reasonably perform thereunder within reasonable time frames;  and/or has clearly and explicitly manifested this to the Raven Art Defendants.

51.  The Raven Art Defendants have materially breached the material terms of the JVA with Plaintiff, continue to refuse to comply therewith, and unless compelled by this Court to do otherwise, will continue to do so.

52.  Plaintiff is informed and believes that representations of the Raven Art Defendants to Plaintiff concerning the JVA were at all times knowingly and/or intentionally false, with the intent and effect of defrauding Plaintiff.

53.  Plaintiff was induced to enter into the JVA by each and all of the aforementioned provisions and representations of the Raven Art Defendants.

54.  Based on those false representations, on which Plaintiff reasonably relied, Plaintiff was induced to make the payments and incur the expenses as above-described.

55.  Plaintiff relied upon the promises and representations of the Raven Art Defendants, to Plaintiff's substantial detriment; and Plaintiff's reliance upon those promises and representations was reasonable under the totality of the circumstances then known to Plaintiff.

56.  Plaintiff would not have entered into the JVA and/or provided the investment capital supplied but for the performance promises and the representations in the executed JVA document and its express protections of Plaintiff's interests mentioned and implicit therein.

57.  In connection with the JVA between Plaintiff and Raven Art Defendants, there is a covenant of good faith and fair dealing, implied by law, and the Raven Art Defendants have breached said covenant, to the material damage to Plaintiff.  Plaintiff asserts both tort and contract damages, the former because of said Defendants' fiduciary duties to Plaintiff and the concomitant trust relationship as imposed by law.

58.  As agent of Plaintiff under the JVA, the Raven Art Defendants were  and are fiduciaries to Plaintiff, with concomitant fiduciary duties.  The Raven Art Defendants have repeatedly breached their fiduciary duties to Plaintiff.

59.  Each and all of the Raven Arts  Defendants, alone and in concert with each of them, proximately and legally caused each and all of the events, acts, omissions, injuries and damages alleged in this Claim, each of which would not have occurred but for the acts and omissions of each of them.

60.  Plaintiff has incurred, and will continue to incur, substantial additional costs and expenses caused by the aforementioned breaches and tortious conduct, plus other consequential damages and/or interest according to proof.

61. Plaintiff has also incurred substantial consequential damages arising from having been prevented from use of his investment funds deprived by tortious acts of the Raven Art Defendants, in an amount according to proof.

62. Plaintiff incurred legal and administrative expenses, in an amount to be proved at trial, in connection with the JVA and its formation; and thereafter, the operations of the JVA.

63. The Raven Art Defendants have acted with malice and in breach of fiduciary duties to Plaintiff, and hence Plaintiff is entitled to treble and/or punitive damages.

64. There are legitimate issue between these parties as to the authenticity, provenance and true value of the JVA and its terms. Hence, Plaintiff is entitled to a declaratory relief as to each of these issues.

65. Plaintiff has made demand on the Raven Art Defendants to correct and cure the aforementioned issues in connection with the JVA, at least to the extent required by law, and the herein alleged breaches and related misconduct and other acts and omissions, and said Defendants have failed and refused to correct or cure same.

## SECOND CLAIM

### Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties

*[Defendants Art Force, LLC; Art Possible, LLC; John Leo Mangan III; Michael William Force; Taryn Burns; Jovian "John" Re; Leslie James]*

66. The allegations for the First Claim [Artwork Capital Investment and Breaches of Contract and Fiduciary Duties] are incorporated herein by this reference.

67. Commencing on or about July 6, 2012 and concluding on or about February 22, 2013, Plaintiff was induced by Defendant Re, acting through and in concert with the Art Force Defendants and Art Possible Defendants, to pay to Defendant Re the gross sum of $793,000, plus other expenses incurred in connection

therewith, for ostensibly authentic, reknowned artworks with ostensibly valid provenance ostensibly numbering twenty-one [21] artworks [hereinafter collectively "Re Supplied Artworks"], paid for in varying installments [hereinafter "Re Artwork Capital Investments"].

68.   In connection with the aforementioned transactions and agreements, Defendant Re, the Art Force Defendants and Art Possible Defendants, separately and in combination, represented that each of the Re Supplied Artworks were and are documented genuine and authentic original artworks, with a documented valid provenance, including but not limited to three [3] ostensible Jackson Pollock paintings which ostensibly were obtained from known Pollock associates, George and Barbara Schulte, with ostensible documentation thereof.

69.  All of these Re Artwork Capital Investments were made pursuant to earn-in contracts with the Art Force Defendants [hereinafter "Re-Art Force Earn-In Contracts"] except for a group of eight [8] drawings purchased pursuant to an earn-in contract with the Art Possible Defendants [hereinafter "Re-Art Possible Earn-In Contract].

70.   Plaintiff is informed and believes that his payments to Defendant Re, without Plaintiff's knowledge, authorization or consent, and without any consideration to Plaintiff, also purchased other artworks which were acquired from Defendant Re by the Art Possible Defendants and/or the Art Force Defendants, or their assignees, without any consideration from any of them other than Plaintiff's aforementioned payments to Defendant Re; and that the Art Possible Defendants and/or the Art Force Defendants received other undisclosed considerations from the proceeds paid by Plaintiff to Defendant Re.

71.   Defendant Re has not adequately authenticated any of the Re Supplied Artworks delivered to Plaintiff, nor has he provided adequate valid provenance; nor have the Art Possible Defendants or the Art Force Defendants, who handled all of the

transactions between Plaintiff and Defendant Re other than Plaintiff's wire payments which were made directly to Defendant Re.

72. The Art Force Defendants have failed to perform any of their duties under the Re-Art Force Earn-In Contracts, including but not limited to provision of authentication or valid provenance of any of the Re Supplied Artworks.

73. The Art Possible Defendants have failed to perform any of their duties under the Re-Art Possible Earn-In Contracts, including but not limited to provision of authentication or valid provenance of any of the Re Supplied Artworks.

74. Of the aforementioned Re Supplied Artworks, at least four [4] are fake: (a) three [3] are fake Jackson Pollock paintings with falsified provenance supported by forged documents, and (b) one is a fake Max Ernst sculpture [hereinafter collectively "Fake Re Supplied Artworks"].

75. In connection with the aforementioned Fake Re Supplied Artworks, Defendant Re, the Art Possible Defendants and/or the Art Force Defendants represented the following as to the alleged value of each of the following alleged authentic originals:

(a) The Fake Jackson Pollock paintings: $15 million to $25 million, as to each of them;

(b) The Fake Max Ernst Sculpture: $600,000 to $750,000?

76. Defendant Re, the Art Possible Defendants and the Art Force Defendants, and each of them, knew before and at all times since the initiation of the Re Artwork Capital Investments that the Fake Re Supplied Artworks were and are fake artworks, with falsified authentication and provenance documents; and the aforesaid Defendants collaborated and acted in concert in said falsification.

77. Plaintiff is informed and believes that Defendant Re, the Art Possible Defendants and the Art Force Defendants, and each of them, have been informed in previous attempts to sell or authenticate one or more of the Re Supplied Artworks that

such artwork[s] is/are not authentic, and yet continued to represent same as authentic; and in no event did said Defendants disclose same to Plaintiff.

78.  Of the remainder of the Re Supplied Artworks, Plaintiff to date has had varying degrees of success in attempting to authenticate them and/or validate their provenance by independent means, and others – but not all – also appear to be fake and/or with falsified provenance.

79.  In connection with one of the Re Supplied Artworks purchased by Plaintiff as above-described, a Leger "Graphite on Paper, Three Musicians" – purchased by Plaintiff as part of the aforementioned purchases – was fraudulently converted by Defendant Re, the Art Possible Defendants and/or the Art Force Defendants [hereinafter "Converted Leger Artwork"].  Plaintiff is informed and believes that the Converted Leger Artwork was sold by one or more of said Defendants for $300,000.

80.  The Converted Leger Artwork was replaced, without Plaintiff's knowledge or consent,  with a Leger "Drawing in Pencil, Steam Locomotive" which Plaintiff has sold for $40,000 in the course of mitigating his damages.  Hence, Plaintiff's damages for this conversion is $260,000.

81.  The Art Force Defendants have not adequately authenticated any of the Re Supplied Artworks delivered to Plaintiff, nor have they provided adequate valid provenance; and have failed to perform any of their duties under the Re-Art Force Earn-In Contracts, including but not limited to provision of authentication work or valid provenance of any of the Re Supplied Artworks.

82.  The Art Possible Defendants have not adequately authenticated any of the Re Supplied Artworks delivered to Plaintiff, nor have they provided adequate valid provenance; and have failed to perform any of their duties under the Re-Art Possible Earn-In Contracts, including but not limited to provision of authentication work or valid provenance of any of the Re Supplied Artworks.

83.  Plaintiff has been damaged by the Fake Re Supplied Artworks and the Leger Converted Artwork by cumulative sum of at least an estimated $875,000,

although the precise amount of damages cannot be certainly, due to the aforementioned acts and omissions of Defendant Re, the Art Possible Defendants and the Art Force Defendants.

84.   The Fake Re Supplied Artworks have placed a cloud on all of the remainder of the Re Supplied Artworks, especially as to at least seven [7] of them which Plaintiff so far has been completely unable by independent means to authenticate and/or validate their provenance.  Even as to those which Plaintiff has been or might be able by independent means to authenticate and/or validate their provenance, this cloud has at least substantially reduced their resale value and/or made resale more difficult, expensive and/or time consuming, thereby damaging Plaintiff according to proof, by at least in the sum of $75,000.

85.   The conduct of Defendant Re, the Art Possible Defendants and the Art Force Defendants as described under this Second Claim breached their contracts with Plaintiff; breached the covenant of good faith and fair dealing that is implied by operation of law; breached their fiduciary duties to Plaintiff; and defrauded Plaintiff with material misrepresentations as above-described.

86.   Plaintiff is informed and believes that  Defendant Re, the Art Possible Defendants and the Art Force Defendants are equitably estopped from denying the agreements alleged herein, having made promises on which Plaintiff detrimentally relied, and having materially benefitted from Plaintiff's acts in reliance.

87.   Plaintiff has at all times complied with his duties and obligations under his agreements with Defendant Re, the Art Possible Defendants and the Art Force Defendants, and performed all promises made by him to the extent obliged thereby; and/or has been ready, willing and able to complete performance thereunder within the time frame specified therein;  and/or has clearly and explicitly manifested this to Defendant Re, the Art Possible Defendants and the Art Force Defendants.

88.   Defendant Re, the Art Possible Defendants and the Art Force Defendants have materially breached the material terms of the agreement between Plaintiff and

1    each of them, continue to refuse to comply therewith, and unless compelled by this

2    Court to do otherwise, will continue to do so.

3         90. Plaintiff is informed and believes that representations of Defendant Re, the

4    Art Possible Defendants and the Art Force Defendants to Plaintiff concerning the

5    agreements between them were at all times knowingly and/or intentionally false, with

6    the intent and effect of defrauding Plaintiff.

7         91.   Based on those and other false representations, on which Plaintiff

8    reasonably relied, Plaintiff was induced to make the payments and incur the expenses

9    as above-described.

10        92. Plaintiff relied upon the promises and representations of Defendant Re, the

11   Art Possible Defendants and the Art Force Defendants, to Plaintiff's substantial

12   detriment; and Plaintiff's reliance upon those promises and representations was

13   reasonable under the totality of the circumstances then known to Plaintiff.

14        93.   Plaintiff would not have entered into the JVA and/or provided the

15   investment capital supplied but for the performance promises and the representations

16   in the executed JVA document and its express protections of Plaintiff's interests

17   mentioned and implicit therein.

18        94. In connection with any contracts between Plaintiff and Defendant Re, the

19   Art Possible Defendants and the Art Force Defendants, there is a covenant of good

20   faith and fair dealing, implied by law, and Defendant Re, the Art Possible Defendants

21   and the Art Force Defendants have breached said covenant, to the material damage

22   to Plaintiff.  Plaintiff asserts both tort and contract damages, the former because of

23   said Defendants' fiduciary duties to Plaintiff and the concomitant trust relationship

24   as imposed by law.

25        95.   As agent of Plaintiff under the Re Artwork Capital Investments,

26   Defendant Re, the Art Possible Defendants and the Art Force Defendants were

27   fiduciaries to Plaintiff, with concomitant fiduciary duties.   Defendant Re, the Art

28

Possible Defendants and the Art Force Defendants have repeatedly breached their fiduciary duties to Plaintiff.

96.  Each and all of the Defendants Re, James, the Art Possible Defendants and the Art Force Defendants, alone and in concert with each of them, proximately and legally caused each and all of the events, acts, omissions, injuries and damages alleged in this Claim, each of which would not have occurred but for the acts and omissions of each of them.

97.  Plaintiff has incurred, and will continue to incur, substantial additional costs and expenses caused by the aforementioned breaches and tortious conduct, plus other consequential damages and/or interest according to proof.

98.  Plaintiff has also incurred substantial consequential damages arising from having been prevented from use of his investment funds deprived by tortious acts of Defendant Re, the Art Possible Defendants and the Art Force Defendants, in an

99.  Plaintiff incurred legal, handling, transportation, storage and expert expenses, in an amount to be proved at trial, in connection with the Re Artwork Capital Investments.

100.  Defendant Re, the Art Possible Defendants and the Art Force Defendants have acted with malice and in breach of fiduciary duties to Plaintiff, and hence Plaintiff is entitled to treble and/or punitive damages.

101.  There are legitimate issue between these parties as to the authenticity, provenance and true value of the Re Supplied Artworks.  Hence, Plaintiff is entitled to a declaratory relief as to each of these issues.

102.  Plaintiff has made demand on Defendant Re, the Art Possible Defendants and/or the Art Force Defendants, at least to the extent required by law,  to correct and cure the aforementioned issues in connection with the mentioned contracts and agreements,  and the herein alleged breaches and related misconduct and other acts and omissions, and said Defendants have failed and refused to correct or cure same.

### THIRD CLAIM

#### Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties

#### [Defendants Art Force, LLC; Michael William Force; Taryn Burns; Leslie James]

103.  The allegations for the First Claim ["Artwork Capital Investment, Fraud in the Inducement, and Breaches of Contract and Fiduciary Duties"] and Second Claim ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"] are incorporated herein by this reference.

104.   Commencing on or about June 6, 2012 and concluding in or about December 2013, Plaintiff was induced by the Art Force Defendants to pay to the Art Force Defendants the gross sum of $695,000, plus other expenses incurred in connection therewith, for ostensibly authentic, reknowned artworks with ostensibly valid provenance ostensibly numbering three [3] / thirteen [13] artworks [hereinafter collectively "Art Force Supplied Artworks"], paid for in varying installments [hereinafter "Art Force Artwork Capital Investments"].

105.  In connection with the aforementioned transactions and agreements, the Art Force Defendants, separately and in combination, represented that each of the Art Force Supplied Artworks were and are documented genuine and authentic original artworks, with a documented valid provenance.

106.  All of these Art Force Artwork Capital Investments were made pursuant to earn-in contracts with the Art Force Defendants [hereinafter "Art Force Earn-In Contracts"].

107.  The Art Force Defendants have not adequately authenticated any of the Art Force Supplied Artworks delivered to Plaintiff, nor have they provided adequate valid provenance; and the Art Force Defendants have failed to perform any of their duties under the Art Force Earn-In Contracts, including but not limited to provision

of authentication work or valid provenance of any of the Art Force Supplied Artworks.

108.   Of the aforementioned Art Force Supplied Artworks, (a) at least one represented to be authentic is in fact fake known by the Art Force Defendants to be fake: a John Fernely, Sr. oil on canvass, currently owned 100% by Plaintiff and in his possession, for which Plaintiff paid Art Force Defendants $25,000; and (b) another, whose authenticity was represented by the Art Force Defendants to be unknown: a Calder Metal Sculpture, currently owned 50% by Plaintiff and 50% by the Art Force Defendants, for which Plaintiff paid $15,000 to a third party 50% owner to acquire that 50% interest, at the urging of the Art Force Defendants.  The latter is now in the unauthorized possession of Defendant Mangan, who initially took possession as a bailee but has since refused repeated demands by Plaintiff for its return [hereinafter "Fake Art Force Supplied Artwork"].

109. In connection with the aforementioned Fake Art Force Supplied Artwork, the Art Force Defendants,  represented the following as to the alleged value of the following alleged originals: The Fake John Fernely, Sr. oil on canvass: $100,000 - $150,000; and the Calder Metal Sculpture, if authentic, at least $1,000,000.

110. The Art Force Defendants, and each of them, knew before and at all times since the initiation of the Art Force Artwork Capital Investments that some or all of the Fake Art Force Supplied Artwork were and are fake or forged, or incapable of authentication, with falsified authentication and provenance documents, or false representations in connection therewith; and the aforesaid Defendants collaborated and acted in concert in said knowing falsifications and false representations.

111. Plaintiff is informed and believes that the Art Force Defendants, and each of them, have been informed in previous attempts to sell or authenticate the Art Force Supplied Artworks that such artwork is not authentic, and yet continued to represent same as authentic; and in no event did said Defendants disclose same to Plaintiff.

112.  Of the remainder of the Art Force Supplied Artworks, Plaintiff to date has had varying degrees of success in attempting to authenticate them and/or validate their provenance by independent means, and others – but not all – also appear to be fake and/or with falsified provenance.

113.  Plaintiff has been damaged by at least $40,000 for the Fake Art Force Supplied Artwork, although the precise amount of damages cannot be certainly stated, due to the aforementioned acts and omissions of the Art Force Defendants.

114.  The Fake Art Force Supplied Artwork has placed a cloud on all of the remainder of the Art Force Supplied Artworks, especially as to at least two [2] of them which Plaintiff so far has been completely unable by independent means to authenticate and/or validate their provenance.  Even as to those which Plaintiff has been or might be able by independent means to authenticate and/or validate their provenance, this cloud has at least substantially reduced their resale value and/or made resale more difficult, expensive and/or time consuming, thereby damaging Plaintiff according to proof, by at least in the sum of $75,000.

115.  The conduct of the Art Force Defendants as described under this Third Claim breached their contracts with Plaintiff; breached the covenant of good faith and fair dealing that is implied by operation of law; breached their fiduciary duties to Plaintiff; and defrauded Plaintiff with material misrepresentations as above-described.

116.  Plaintiff is informed and believes that  the Art Force Defendants are equitably estopped from denying the agreements alleged herein, having made promises on which Plaintiff detrimentally relied, and having materially benefitted from Plaintiff's acts in reliance.

117.  Plaintiff has at all times complied with his duties and obligations under his agreements with the Art Force Defendants, and performed all promises made by him to the extent obliged thereby; and/or has been ready, willing and able to complete performance thereunder within the time frame specified therein;  and/or has clearly and explicitly manifested this to the Art Force Defendants.

118.   The Art Force Defendants  have materially breached the material terms of the agreement between Plaintiff and each of them, continue to refuse to comply therewith, and unless compelled by this Court to do otherwise, will continue to do so.

119.   Plaintiff is informed and believes that representations of the Art Force Defendants to Plaintiff concerning the agreements between them were at all times knowingly and/or intentionally false, with the intent and effect of defrauding Plaintiff.

120.   Based on those and other false representations, on which Plaintiff reasonably relied, Plaintiff was induced to make the payments and incur the expenses as above-described.

121.   Plaintiff relied upon the promises and representations of the Art Force Defendants, to Plaintiff's substantial detriment; and Plaintiff's reliance upon those promises and representations was reasonable under the totality of the circumstances then known to Plaintiff.

122.   Plaintiff would not have entered into the agreements and/or provided the investment capital supplied but for the performance promises and the representations in the Art Force Earn-In Contracts and their express protections of Plaintiff's interests mentioned and implicit therein.

123.   In connection with any contracts between Plaintiff and Art Force Defendants, there is a covenant of good faith and fair dealing, implied by law, and the Art Force Defendants have breached said covenant, to the material damage to Plaintiff.  Plaintiff asserts both tort and contract damages, the former because of said Defendants' fiduciary duties to Plaintiff and the concomitant trust relationship as imposed by law.

124.   As agent of Plaintiff under the Art Force Artwork Capital Investments, the Art Force Defendants were fiduciaries to Plaintiff, with concomitant fiduciary duties.  The Art Force Defendants have repeatedly breached their fiduciary duties to Plaintiff.

125.   Each and all of the Art Force Defendants, alone and in concert with each of them, proximately and legally caused each and all of the events, acts, omissions, injuries and damages alleged in this Claim, each of which would not have occurred but for the acts and omissions of each of them.

126.   Plaintiff has incurred, and will continue to incur, substantial additional costs and expenses caused by the aforementioned breaches and tortious conduct, plus other consequential damages and/or interest according to proof.

127.   Plaintiff has also incurred substantial consequential damages arising from having been prevented from use of his investment funds deprived by tortious acts of the Art Force Defendants, in an amount according to proof.

128.   Plaintiff incurred legal, handling, transportation, storage and expert expenses, in an amount to be proved at trial, in connection with the Fake Art Force Supplied Artwork.

129.   The Art Force Defendants have acted with malice and in breach of fiduciary duties to Plaintiff, and hence Plaintiff is entitled to treble and/or punitive damages.

130.   There are legitimate issue between these parties as to the authenticity, provenance and true value of the Art Force Supplied Artworks.  Hence, Plaintiff is entitled to a declaratory relief as to each of these issues.

131.   Plaintiff has made demand on the Art Force Defendants, at least to the extent required by law, to correct and cure the aforementioned issues in connection with the mentioned contracts and agreements, and the herein alleged breaches and related misconduct and other acts and omissions, and said Defendants have failed and refused to correct or cure same.

///

///

///

COMPLAINT FOR DAMAGES, CONSTRUCTIVE TRUST AND/OR INJUNCTIVE / DECLARATORY RELIEF

# FOURTH CLAIM

## Art Earn-In Contracts in Favor of Plaintiff
## and Anticipatory Breaches of Contract

### *[Defendants Art Force, LLC; Michael William Force; Taryn Burns;*
### *Art Possible, LLC; John Leo Mangan III]*

132.  The allegations for the First Claim ["Artwork Capital Investment, Fraud in the Inducement, and Breaches of Contract and Fiduciary Duties"], Second Claim ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"] and Third Claims ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"] are incorporated herein by this reference.

133.  In the course of Plaintiff's dealings with the Art Force Defendants and Art Possible Defendants, Plaintiff was authorized by said Defendants to take possession of nine [9] artworks ostensibly owned by said Defendants [hereinafter "Miscellaneous Art Force and Art Possible Artworks"], under an earn-in agreements under which Plaintiff would provide the capital, time and effort to arrange for repair and restoration for sale, pay for any requisite experts, and/or assist in marketing for sale, for which Plaintiff would receive from any sale (a) reimbursement of any costs and expenses advanced for aforementioned services; and (b) fifty percent [50%] of the balance after said reimbursement [Karlsson Earn-In Contracts].

134.  As a result of subsequent dealings and communications between Plaintiff and the Art Force Defendants and Art Possible Defendants, Plaintiff is informed and believes that of the nine [9] Miscellaneous Art Force and Art Possible Artworks, at least five [5] are not authentic and/or supported by valid provenance, and four [4] are of uncertain authenticity and provenance.

135.  Of the nine [9] Miscellaneous Art Force and Art Possible Artworks, five [5] were owned by Art Force Defendants, one [1] is owned by Art Possible Defendants, and three [3] are owned by a third party who had consigned them to the

Art Force Defendants for repair, restoration and sale [hereinafter "Third Party Miscellaneous Artworks"].

136.  The authenticity and provenance of the five [5] Miscellaneous Art Force Artworks is unknown and under a cloud due to the matters set forth in the Second and Third Claims herein.

137.  The authenticity and provenance of the Miscellaneous Art Possible Artwork is unknown and under a cloud due to the matters set forth in the Second and Third Claims herein; however, Plaintiff has obtained preliminary authentications via independent means.

138.  The authenticity and provenance of the three [3] Miscellaneous Third Party Artworks is unknown and under a cloud due to the matters set forth in the Second and Third Claims herein.

139.  Plaintiff has incurred substantial costs and expenses, and expended substantial time and effort, in connection with and as performance under the Karlsson Earn-In Contracts.

140.  Plaintiff has offered to return the Miscellaneous Third Party Artworks to whomever the Third Parties and Art Force Defendants will agree as intended recipients, as currently, the Third Parties and Art Force Defendants have given Plaintiff conflicting instructions in this regard.

141.  There are legitimate issue between these parties as to the authenticity, provenance and true value of the Miscellaneous Art Force and Art Possible Artworks; and as to the contractual and other legal rights of Plaintiff in connection therewith. Hence, Plaintiff is entitled to a declaratory relief as to each of these issues.

///

///

///

# FIFTH CLAIM

### Breach of Contract; Fraud in the Inducement; Causation; Theft and Conversion; Breach of Fiduciary Duty

### *[Defendant Leslie James]*

142.  The allegations for the First Claim ["Artwork Capital Investment, Fraud in the Inducement, and Breaches of Contract and Fiduciary Duties"], Second Claim ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"] and Third Claims ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"] are incorporated herein by this reference.

143.  Plaintiff is informed and believes that Defendant James has acquired a great number of ostensibly authentic renowned artworks, mostly ostensible Picasso artworks, from the Art Force Defendants, at prices that belie their authenticity [hereinafter "James Art Collection"].

144.  Plaintiff is informed and believes that Defendant James has not re-sold any of the artworks in the James Art Collection, instead collecting them for the purpose of self-publication of an art compendium designed to create or enhance his standing as an expert collector and dealer in artworks, in general, and in Picasso, in particular.  The aforementioned publication is entitled "Picasso & the Secret Muse" by Leslie James [2013-2014] [hereinafter "James Publication"].

145.   Defendant James knew or reasonably should have known that his representations re  the Art Force Defendants were untrue in whole or in part; that the Art Force Defendants traffic, and have trafficked,  in ostensibly renowned artworks that are not authentic and/or lack valid provenance; and that Plaintiff was being induced to purchase fake or forged artworks from the Art Force Defendants and their associates, the Art Possible Defendants and Defendant Re.

146.   Defendant James has included in the James Publication copies of artworks, presented as authentic pieces from renowned artists, which he knows, or reasonably should know, to be fakes or forgeries.

147.   Defendant James has also included in the James Publication copies of artworks which are owned by Plaintiff, involving a collection of twelve [12] paintings by Gaston Longchamps, which were delivered by Plaintiff to Defendant James in or about March-April, 2013 to be photographed for inclusion in the then pending James Publication [hereinafter the " Longchamps Collection"].

148.   After photographing the Longchamps Collection, Defendant James returned Plaintiff all but one of the Longchamps Collection, keeping the oil on canvass portrait of "Gabriele d'Annunzio" and claiming it to be his own because, he alleges, he had previously purchased and obtained it from the prior seller who had sold the Longchamps Collection to Plaintiff, and somehow the artwork ended up back in possession of said seller.  Defendant James has no documentation of the alleged purchase by himself; conversely, Plaintiff has a bill of sale showing him to be the true owner of that artwork.

149.  Commencing on June 11, 2012 and ending on January 3, 2013, Plaintiff loaned Defendant James a total of $75,500, payable on demand, at an interest rate of ten percent [10%] per annum since January 3, 2013 when Defendant James refused to execute the contract whose terms had been agreed to between Plaintiff and Defendant James.

150.  Defendant James provided Plaintiff with collateral for said loans in the form of one alleged authentic Pollock painting and one alleged authentic deKoonig painting ["James Collateral Paintings"].

151.  After initial demands for repayment, and after Plaintiff paid $5000 to two art experts for attempted verification of authenticity of the James Collateral Paintings and obtained negative results which were reported to Defendant James, Defendant James induced Plaintiff to return the James Collateral Paintings, with the pretext that

he had imminently available purchasers therefor, from which repayment would be made.

152.  In fact, Plaintiff is informed and believes, there were no purchasers, not evenly potential; the James Collateral Paintings have not been sold and are currently displayed in the James Publication as authentic paintings of the represented authors; and the James Collateral Paintings are fake and Defendant James has known them to be fake at all relevant times, having been so informed by Defendant Force when Defendant James purchased them from Defendant Force.

153.  Written demand with 90-day notice was made on Defendant James to repay said loans, and Defendant has failed and refused to do so.

154.  Plaintiff is informed and believes that Defendant James never intended to repay the loans and hence the promises to repay were fraud in the inducement.

155.  Plaintiff has made demand on Defendant James, at least to the extent required by law, to return the "Gabriele d'Annunzio" portrait, and said Defendant has failed and refused to do so.

156.  Plaintiff relied upon the promises and representations of Defendant James, to Plaintiff's substantial detriment; and Plaintiff's reliance upon those promises and representations was reasonable under the totality of the circumstances then known to Plaintiff.

157.  Plaintiff would not have entered into the various transactions and agreements with or through the Art Force Defendants, and from the Art Possible Defendants and then Defendant Re, but for the representations of Defendant James concerning Defendant Force as above-described.

158.  Plaintiff would not made the loans to Defendant James but for the representations of Defendant James concerning his intent to repay them.

159.  As agent of Plaintiff in connection with the Longchamps Collection, Defendant James was a fiduciary to Plaintiff, with concomitant fiduciary duties. Defendant James has repeatedly breached his fiduciary duties to Plaintiff.

160.   Plaintiff has incurred, and will continue to incur, substantial additional costs and expenses caused by the aforementioned breaches and tortious conduct, plus other consequential damages and/or interest according to proof.

161. Plaintiff has also incurred substantial consequential damages arising from having been prevented from use of his investment funds deprived by tortious acts of Defendant James, in an amount according to proof.

162.   Plaintiff incurred legal, handling, transportation, storage and expert expenses, in an amount to be proved at trial, in connection with the James Collateral Paintings.

163.   Defendant James has acted with malice and in breach of fiduciary duties to Plaintiff, and hence Plaintiff is entitled to treble and/or punitive damages.

### SIXTH CLAIM

**Yacht Investment Fraud Scheme and
Related Torts and Breaches of
Contract and Fiduciary Duties**

*[Defendants Art Possible, LLC; John Leo Mangan III;
Michael William Force]*

164.   The allegations for the First Claim ["Artwork Capital Investment, Fraud in the Inducement, and Breaches of Contract and Fiduciary Duties"], Second Claim ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"], Third Claim ["Art Investment Fraud Scheme and Related Torts and Breaches of Contract and Fiduciary Duties"] and Fourth  Claim ["Art Earn-In Contracts in Favor of Plaintiff and Anticipatory Breaches of Contract"] are incorporated herein by this reference.

165.   Commencing in middle 20012, Defendant Force, later joined by Defendant Mangan, commenced trying to interest Plaintiff in jointly purchasing a motor pleasure yacht, to which Plaintiff remained non-committal, but not really interested.

166.   On or about November 9, 2012, Plaintiff loaned the Art Possible Defendants and Defendant Force the sum of $40,000 for purposes of making an initial deposit on a motor pleasure yacht moored in Florida [hereinafter "Motor Pleasure Yacht"], with continued efforts to convince Plaintiff join them in the purchase, while Plaintiff continued to remain noncommittal, and disinterested.

167.   On or about November 28, 2012, Plaintiff loaned the Art Possible Defendants and Defendant Force the additional sum of $42,500, also for purposes of paying the balance of the initial deposit on the Motor Pleasure Yacht, again with continued efforts to convince Plaintiff join them in the purchase, while Plaintiff continued to remain noncommittal, and disinterested.

168.   Each of these loans on November  9 & 28, 2012 were induced by promises of prompt repayment from art sales – from both artworks mentioned in preceding claims herein as well as art sales from the alleged inventory of the Art Possible Defendants – which aforesaid Defendants represented were imminent and/or pending for sums far in excess of the loaned funds [hereinafter "Imminent Pending Art Sales"].   The loaned funds were paid directly to a boat sales broker.

169.   Finally, the Art Possible Defendants and Defendant Force induced Plaintiff to agree to purchase and become a one-third owner of the Motor Pleasure Yacht, by rolling over the $82,500 in loans into his share of the purchase price of $273,500, with the balance of his share of $191,000 to be paid directly to the seller via the boat sales broker.

170.   The Art Possible Defendants and Defendant Force induced Plaintiff to finally agree to become a one-third owner of the Motor Pleasure Yacht by making representations that: (a) Defendant Mangan was and is an experienced pleasure yacht buyer, seller, owner and operator; (b) the purchase price of $820,500 ["Yacht Purchase Price"] was the product of effective, hard bargaining by Defendant Mangan; ( c) the Motor Pleasure Yacht was in good condition and working order; (d) the yacht would be  a bargain "at twice the price" of the Yacht Purchase Price, and hence would

be an asset easily resold for a price in excess of the Yacht Purchase Price; and (e) that the Art Possible Defendants and Defendant Force had the financial means pay for their respective one-third shares of the Motor Pleasure Yacht, at approximately $273,500 each, and would in fact do so by virtue of Imminent Pending Art Sales.

171.   On or about December 5, 2012, the Art Possible Defendants and Defendant Force induced Plaintiff to agree to pay the full balance of the purchase price for the Motor Pleasure Yacht beyond, in the sum of $738,000, for a total purchase price of $820,500, including their respective one-third shares of $191,000 each, with title to be temporarily taken jointly by Plaintiff and the Art Possible Defendants; and with their respective shares to be paid promptly from the aforementioned Imminent Pending Art Sales.

172.   On or about December 5, 2012, the Art Possible Defendants and Defendant Force also induced Plaintiff to advance $200,000, which was to be spent on outfitting, insurance, and modest repairs and maintenance ["Upgrade and Maintenance Funds"], claiming that the need therefor was created largely by the previous owner who had allegedly stripped the boat of much of the equipment, furniture and other outfitting of the boat.

173.   The aforementioned $200,000 was to be wired to the account of Defendant Art Possible, with the understanding that the Art Possible Defendants were then in process of setting up a joint account under control of Plaintiff and the Art Possible Defendants to which the funds would then be forwarded and from which the Motor Pleasure Yacht expenditures were to be made; and the Art Possible Defendants and Defendant Force represented that Plaintiff would be provided with expeditious, thorough and professional accountings of all funds expended from the $200,000 or otherwise in connection with the Motor Pleasure Yacht, and that each of them would repay to Plaintiff their respective one-third shares of the $200,000, in the sum of approximately $66,500, along with their respective one-third each of the $820,000

capital contributions to the purchase of said boat, for a total repayment of $$680,000, or $340,000 from each of them.

174.   Once Plaintiff had made the full, cumulative expenditures of $1,020,500, the Art Possible Defendants and Defendant Force , the Art Possible Defendants and Defendant Force informed Plaintiff that they each would need up to a year to pay their respective cumulative one-third shares.

175.   Based on the latter, on December 17, 2012, documents were executed to provide that Plaintiff is the sole owner of the Motor Pleasure Yacht, held in the name of an entity solely owned by Plaintiff.

176.   The Art Force Defendants delayed and stalled creating the contemplated joint account, never in fact doing so, with the $200,000 being commingled with the funds of the Art Possible Defendants, until the $200,000 was fully exhausted.

177.   Plaintiff is informed and believes that the Art Possible Defendants misused, diverted and converted and/or embezzled the Upgrade and Maintenance Funds as follows: (a) $60,000 was spent on an art investment by the Art Possible Defendants; and (b) funds in as yet unknown amounts were spent on (i) personal expenses of the Art Possible and Art Force Defendants in connection with an international cruise taken with the Motor Pleasure Yacht, commencing in the latter half of December 2012; (ii) capital repairs of the Motor Pleasure Yacht, which necessity was contrary to prior representations of said Defendants and the represented value of the yacht; and (iii) other personal expenses of the Art Possible Defendants.

178.   In or about March 2013, the Art Possible Defendants induced and/or coerced Plaintiff to pay an additional $35,000 to reimburse him for allegedly paying same for advanced repair and maintenance work ["Supplemental Upgrade and Maintenance Funds"], on this occasion doing so by holding a bona fide art sale and the purchase proceeds hostage and making concomitant threats.

179.   The Art Possible Defendant never provided any adequate accounting of the expenditures of the Upgrade and Maintenance Funds and/or Supplemental

1    Upgrade and Maintenance Funds, except in some inadequate generalities, despite

2    repeated demands therefor which were made by Plaintiff, orally and in writing.

3        180.   Plaintiff has since been informed, and/or otherwise learned, that (a)

4    Defendant Mangan could have negotiated a lower purchase price for the Motor

5    Pleasure Yacht, by up to $100,000, but did not do so because he was in an apparent

6    hurry, for his own personal reason – his intended family holiday international

7    pleasure cruise; (b) that at the time of purchase of the Motor Pleasure Yacht, it

8    required substantial capital repairs, with additional capital repairs made necessary by

9    the premature international pleasure cruise, much of which was paid for out of the

10   $200,000 supplied by Plaintiff, or thereafter paid directly by Plaintiff; and ( c) that the

11   true fair market value of  the Motor Pleasure Yacht at the time of purchase on

12   December 5, 2012 was substantially less than the paid Yacht Purchase Price, and that

13   with the aforementioned capital repairs, the fair market value is no more than the

14   Yacht Purchase Price.

15       181. Concomitant with the aforementioned transactions in connection with the

16   Motor Pleasure Yacht, the Art Possible Defendants induced Plaintiff to pay for lease

17   payments on a shoreline residence with a boat slip to dock and maintain the Motor

18   Pleasure Yacht ["Leased Premises"], representing that the leased premises were

19   suitable for the purpose.  Plaintiff expended a cumulative sum of an estimated

20   $34,772 for the Leased Premises.

21       182.  To the contrary, the boat slip of the Leased Premises was not  suitable for

22   the purpose of docking the Motor Pleasure Yacht, and Plaintiff was required to obtain

23   and pay for other suitable docking facilities; and the Art Possible Defendants acted

24   with negligence and/or reckless disregard in respect to Plaintiff's interests in

25   connection therewith. Plaintiff has expended $27,500 for the alternative docking

26   facilities, and continues to incur such expenses.

27       183.  Plaintiff incurred legal, administrative, title, licensing, and corporate

28   formation expenses, in an amount to be proved at trial, in connection with the

purchase and acquisition of the Motor Pleasure Yacht; the ostensible Defendants' repayment and future partner arrangements for the Motor Pleasure Yacht; related use, maintenance, storing, docking and other arrangements for the Motor Pleasure Yacht; and mitigation of damages via resale of the Motor Pleasure Yacht.

184.   The Art Possible Defendants and Defendant Force, and each of them, knew before and at all times since the initiation of the purchase of the Motor Pleasure Yacht that its true fair market value was less than Yacht Purchase Price; that the representations to Plaintiff regarding the value, condition and resale capacity of the Yacht Purchase Price were materially false; and the aforesaid Defendants collaborated and acted in concert in said falsifications.

185.   Plaintiff has been cumulatively damaged by at least $1,355,000, with other damages as yet unknown and further damages continuing to accrue for the indefinite future, due to an caused by the various falsifications, malfeasance, misfeasance and/or nonfeasance in connection with Motor Pleasure Yacht, due to the aforementioned acts and omissions of the Art Possible Defendants and/or Defendant Force.

186.   The conduct of the Art Possible Defendants and/or Defendant Force as described under this Sixth Claim breached their contracts with Plaintiff; breached the covenant of good faith and fair dealing that is implied by operation of law; breached their fiduciary duties to Plaintiff; and defrauded Plaintiff with material misrepresentations as above-described.

187.   Plaintiff is informed and believes that the Art Possible Defendants and/or Defendant Force are equitably estopped from denying the agreements alleged herein, having made promises on which Plaintiff detrimentally relied, and having materially benefitted from Plaintiff's acts in reliance.

188.   Plaintiff has at all times complied with his duties and obligations under his agreements with the Art Possible Defendants and/or Defendant Force, and performed all promises made by him to the extent obliged thereby.

189.  Plaintiff is informed and believes that representations of the Art Possible Defendants and/or Defendant Force to Plaintiff concerning the agreements between them, and related inducements and intended performance, were at all times knowingly and/or intentionally false, with the intent and effect of defrauding Plaintiff.

190.  Based on those and other false representations, on which Plaintiff reasonably relied, Plaintiff was induced to make the payments and incur the expenses as above-described.

191.  Plaintiff relied upon the promises and representations of the Art Possible Defendants and/or Defendant Force, to Plaintiff's substantial detriment; and Plaintiff's reliance upon those promises and representations was reasonable under the totality of the circumstances then known to Plaintiff.

192.  Plaintiff would not have entered into the agreements and/or provided the investment capital supplied but for the performance promises and the representations of the Art Possible Defendants and/or Defendant Force.

193.  In connection with any contracts between Plaintiff and Art Force Defendants, there is a covenant of good faith and fair dealing, implied by law, and the Art Possible Defendants and/or Defendant Force have breached said covenant, to the material damage to Plaintiff.  Plaintiff asserts both tort and contract damages, the former because of said Defendants' fiduciary duties to Plaintiff and the concomitant trust relationship as imposed by law.

194.  As agent of Plaintiff,  the Art Possible Defendants were fiduciaries to Plaintiff, with concomitant fiduciary duties.  The Art Possible Defendants have repeatedly breached their fiduciary duties to Plaintiff.

195.  Each and all of the Art Possible Defendants and/or Defendant Force, alone and in concert with each of them, proximately and legally caused each and all of the events, acts, omissions, injuries and damages alleged in this Claim, each of which would not have occurred but for the acts and omissions of each of them.

196.  Plaintiff has incurred, and will continue to incur, substantial additional costs and expenses caused by the aforementioned breaches and tortious conduct, plus other consequential damages and/or interest according to proof.

197. Plaintiff has also incurred substantial consequential damages arising from having been prevented from use of his investment funds deprived by tortious acts of the Art Possible Defendants and/or Defendant Force, in an amount according to proof.

198.  Plaintiff has a constructive trust in the artwork purchased by the Art Possible Defendants for $60,000 from the Upgrade and Maintenance Funds and/or in the proceeds from any sale thereof or any other artwork for which it was exchanged or traded.

199.   The Art Possible Defendants and/or Defendant Force have acted with malice and in breach of fiduciary duties to Plaintiff, and hence Plaintiff is entitled to treble and/or punitive damages.

200. Plaintiff has made demand on the Art Possible Defendants and Defendant Force, at least to the extent required by law, to correct and cure the aforementioned issues in connection with the Motor Pleasure Yacht purchase and the herein alleged breaches and related misconduct and other acts and omissions, and said Defendants have failed and refused to correct or cure same.

## COMMON ALLEGATIONS RE DAMAGES, INJUNCTIVE RELIEF AND CONSTRUCTIVE TRUST AS ALL THREE CLAIMS

201.   As a consequence of the statements, acts and/or omissions of the Defendants, in respect to each claim, and each of them, Plaintiff has incurred monetary damages as above described, as well as other consequential damages caused by the acts and omissions of said Defendants, in an amount to be proved at trial.

202.  Plaintiff has incurred, and continues to incur,  substantial emotional distress from the fraudulent and other tortious conduct of Defendants and each of

them, proximately caused by the acts and omissions of said Defendants, in an amount to be proved at trial.

203.  The Defendants and each of them, in engaging in the aforementioned fraudulent and other tortious conduct, acted with malice.  Plaintiff is entitled to recover treble and/or punitive damages from Defendants, and each of them, in an amount to be proved at trial.

204.  Plaintiff is likely to prevail on the merits at trial of the matters framed by this Complaint.

205.  Defendants and each of them have unclean hands.

206.  Any balance of equities and/or irreparable harm weighs substantially in favor of Plaintiff and against Defendants and each of them.

207.  Plaintiff is entitled to preliminary and permanent injunctive and declaratory relief as to ownership, possession and value of, and as to any security interest in, the miscellaneous artworks as described herein; and to preserve evidence in connection with the art fraud claims.

208.  In connection with the latter, (a) Plaintiff holds miscellaneous artworks of unknown value, and Plaintiff seeks orders permitting temporary and permanent possession, pending final determinations as to ownership, possession and value of, and as to any contractual interest in said artworks as described herein; and (b) Defendants hold the miscellaneous artworks which are the best evidence of their fraudulent / forged status, necessary for any independent expert analysis or related discovery herein, and are reasonably likely to be destroyed or otherwise disposed of by the Defendants.

## PRAYER

**WHEREFORE,** Plaintiff seeks judgment against Defendants and each of them for:

1.  Compensatory damages, according to proof;

2.  Special and actual damages, according to proof;

COMPLAINT FOR DAMAGES, CONSTRUCTIVE TRUST AND/OR INJUNCTIVE / DECLARATORY RELIEF

3.  Consequential damages, according to proof;

4.  Punitive and/or treble damages, according to proof;

5.  Temporary, preliminary and/or permanent injunctive relief to compel specific performance of the agreements, to impose constructive trusts, to protect evidence or interests at risk of irreparable harm, and/or for declaratory relief;

6.  Attorney fees and/or other legal costs as may be allowed by contract or law; and

7.  For such further relief as the Court may deem necessary and proper.

Dated: June 11, 2014                    Respectfully submitted,

                                        /s/ Meir J. Westreich
                                        _____
                                        Meir J. Westreich
                                        Attorney for Plaintiff

Plaintiff demands trial by jury.

Dated: June 11, 2014

                                        /s/ Meir J. Westreich
                                        _____
                                        Meir J. Westreich
                                        Attorney for Plaintiff